**Bernard M. BARRETT, Jr., M.D. and Plastic & Reconstructive Surgeons, P.A., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civil Action No. H–83–6929.**

United States District Court, S.D. Texas, Houston Division.

Dec. 8, 1995.

494

Edward D. Urquhart, Houston, TX, Stuart D. Gibson, Trial Atty. Tax Division, Washington, DC, for Bernard M. Barrett, Jr., Plastic & Reconstructive Surgeons, P.A.

Robert Alton Shults, Sheinfeld Maley & Kay, Houston, TX, Michael K. Kelly.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HARMON, District Judge.

The following constitute this court's Findings of Fact and Conclusions of Law on the damage issue remanded to this court by the Fifth Circuit Court of Appeals in its April 20, 1995 decision, *Barrett v. United States*, 51 F.3d 475 (5th Cir.1995).

In the above referenced action, Plaintiff Dr. Bernard M. Barrett, Jr. has asserted unlawful disclosure of tax return information during a civil and criminal investigation by the Internal Revenue Service ("IRS") in violation of 26 U.S.C. § 6103(k)(6) [1] and § 7431.[2] Barrett seeks to recover $8,629,208.00 in actual damages and $25,887,624.00 in punitive damages, for a total sum of $34,516,832.00.[3]

The trial of this case focused on a very narrow issue, mandated by the 1986 opinion of the Fifth Circuit Court of Appeals, which reversed the granting of a summary judgment in favor of the United States by the Honorable Gabrielle McDonald. The Fifth Circuit found that there was a triable fact issue presented by the two "interdependent" questions of "whether the disclosures of [Dr. Bernard M. Barrett, Jr.'s] taxpayer information were necessary, and whether the information sought was otherwise reasonably available." *Barrett v. United States*, 795 F.2d 446, 449 (5th Cir.1986).

At trial Barrett's position was two-fold. First, he argued that the information being sought by the letters was "otherwise reasonably available" to the IRS in that it was contained in the records, particularly the bank records, of Barrett and his professional association, Plastic & Reconstructive Surgeons, P.A. (PARS). Second, he argued that

1. This statute states,
   An internal revenue officer or employee may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.

2. Title 26 U.S.C. § 7431(a)(1) provides,
   If any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States. Furthermore, no liability attaches to any disclosure that results from a good faith, but erroneous interpretation of § 6103. 26 U.S.C. § 7431(b).

3. As pointed out by the government in its supplemental opposition to Bernard M. Barrett's request for entry of findings of fact and conclusions of law and final judgment regarding damages on remand (# 256), by order of July 26, 1995 the Fifth Circuit denied Plaintiffs' motion for award of attorneys' fees and costs under 26 U.S.C. § 7430, thus precluding them from pursuing the fees and costs on remand. *Knotts v. United States*, 893 F.2d 758 (5th Cir.1990).

even if the information was not otherwise reasonably available, the letters unnecessarily disclosed "return information." This disclosure was accomplished first by typing the words "Criminal Investigation Division of the Internal Revenue Service" at the top of the letter, and second, by informing the recipients in the body of the letter that Barrett "is currently under investigation by the Criminal Investigation Division of the Internal Revenue Service." This court found for the United States on both issues. On appeal the Fifth Circuit concluded that it was not necessary for the IRS to disclose in the letters that the taxpayer was being criminally investigated, that the IRS Special Agent Michael O. Hanson, the author of the letters, acted in bad faith in mailing the circular letters containing that disclosure, and that the IRS is liable for damages to Barrett pursuant to 26 U.S.C. § 6103.

The IRS conceded at trial that, although the sending of the letters was approved by Agent Hanson's superior, Charles T. Fanssen, then Group Manager of the Criminal Investigation Division, Houston, Texas, there was no evidence that Fanssen had approved the contents of the circular form letters that Agent Hanson mailed to Barrett's patients. Nor did the language of the letters follow completely the form for such letters suggested in Section 347.2 of The Handbook for Special Agents, in effect at the time.

In determining whether Hanson acted in good faith in making the disclosures in the letter, the Fifth Circuit recited the standard set forth in *Huckaby v. United States Department of Treasury, Internal Revenue Service,* 794 F.2d 1041, 1048 (5th Cir.1986), which is "whether a reasonable IRS agent would have known of the rights provided by [§§ 6103 and 7431] and of his own agency's applicable regulations and internal rules [interpreting the statutes]." Following *Hucka-*

*by's* conclusion that a reasonable IRS agent can be expected to know the statutory provisions and their clarification by IRS regulations and interpretations, *id.* at 1049, the Fifth Circuit concluded that "[a] reasonable IRS agent can be expected to know statutory provisions governing disclosure, as interpreted and reflected in IRS regulations and manuals. An agent's contrary interpretation is not in good faith [citations omitted]." *Barrett,* 51 F.3d at 479. Since Hanson admitted at trial that he did not review § 6103 or the applicable IRS manual provisions prior to mailing the circular letters and, although he was aware of the handbook provision that he do so, did not obtain the required approval of the content of the letters by the Chief of the Criminal Investigation Division, the Fifth Circuit concluded that Hanson had not acted in good faith in mailing the particular letters he mailed. *Id.,* citing C. 347.2 of the IRS Handbook for Special Agents.

Significant to the inquiry here, however, is that the Fifth Circuit did not find that the information sought by Hanson in mailing the letters was "otherwise reasonably available." [4] In other words, Hanson was found to have violated the statute not by mailing circular letters, but by disclosing in the circular letters taxpayer information unnecessary to obtain the information he sought. *Barrett,* 51 F.3d at 480. Although the Handbook directs the sender of the letter to identify himself as a "special agent, Criminal Investigative Division," the Fifth Circuit found that it was unnecessary and therefore an unauthorized disclosure for Agent Hanson to tell the letters' recipients, in the body of the letter, that Barrett was under a criminal investigation. The determination left to this court is what actual damages, if any, has plaintiff proved were inflicted by the disclosure of the criminal investigation in the circular letters. [5]

4. Although in reversing the district court the Fifth Circuit emphasized the Government's failure to show the necessity for informing the letters' recipients in the body of the letter that Barrett was under investigation by the Criminal Investigation Division of the IRS, and the failure of Agent Hanson to explain why he had not followed procedures, the major issue at trial was the necessity of sending the letters in the first place.

5. Barrett disputes the authority of this court to find that there were no damages, given the language used by the Fifth Circuit in remanding the case, "We acknowledge that Dr. Barrett presented uncontradicted evidence of his damages during trial.... We believe, however, that the trial level is the appropriate site for the factual determination of the amount of damages to be awarded to Dr. Barrett as a result of Agent Hanson's mailing of the circular letters." *Barrett,* 51 F.3d

Barrett emphasizes that, as noted by the Fifth Circuit, his evidence of his actual damages was "uncontradicted" at trial. *Barrett,* 51 F.3d at 480. He contends that he is entitled to an award of at least $8,629,208 in actual damages and requests an award of punitive damages under 26 U.S.C. § 7431(c)(1)(B). The United States opposes the requested actual and punitive damages award, pointing out that it vigorously contested Plaintiffs' damage claims at trial on cross examination, and that it did not brief the damages issue on appeal because this court did not reach the question since it found the IRS was not liable. The United States maintains that Barrett did not suffer any economic loss as a result of the disclosure and is entitled to recover only statutory damages in the amount of $260,000, in accordance with 26 U.S.C. § 7431(c)(1)(A).[6]

The Court has reviewed the transcripts of the testimony of all five of the damage witnesses brought forth by Barrett at the trial. These witnesses were Karl M. Johnson, C.P.A., plaintiff's expert who presented a damage model, and four physicians, including plaintiff. This testimony points to a decline in the number of patients seen by Barrett beginning in 1986 and a possibility that this decline was caused by a delayed reaction to the circular letters, which were sent in March of 1983.

Barrett's argument is that, but for the circular letters, his practice would have been more substantial. The patients of a plastic surgeon are particularly concerned that their privacy be maintained. If one day such a patient receives a letter from the IRS telling him that his plastic surgeon is the subject of a criminal investigation, he may have two impressions. First, he may believe that the IRS has obtained information from his plastic surgeon that he was a plastic surgery patient—a violation of his privacy that he may not realize was not breached

voluntarily by the doctor. Second, he is now, unambiguously, aware that his plastic surgeon is suspected of criminal activity by the IRS, which is likely to reflect negatively on the plastic surgeon. Barrett argues that when his 260 patients received this letter, they would have become angry with Barrett because their privacy had been breached, since someone besides Barrett and his staff would know they had been treated by Barrett. Second, when the patients read that Barrett was under criminal investigation, they would have thought less of Barrett as a law abiding citizen. Barrett maintains that both these circumstances would render the patients disinclined to return to him for further plastic surgery and to recommend him to their friends. Although there was some discussion in the testimony that the letters could cause other physicians not to refer patients to Barrett, there was no evidence that any physician had, in fact, not referred patients because of the letters. In fact the testimony of the physicians among the witnesses all emphasized that Barrett enjoys an excellent reputation as a surgeon.

Barrett's argument ignores an important aspect of the Fifth Circuit's decision, which did not determine that the letters themselves were not necessary to obtain the information being sought. The patients who received these letters would have had the same impression of breach of privacy whether Special Agent Hanson wrote his letter by the Handbook and made no unauthorized disclosure or whether he ignored the Handbook and included in the letter disclosures unnecessary to obtain the information being sought. In this case, any actual damages must have arisen from the disclosure to the patients of the criminal investigation itself and not from the concern of the patients that their privacy had been breached.

Although there is factual evidence to demonstrate a decline in the number of patients

---

at 480. He argues that this language makes both causation and amount of damage a foregone conclusion. This court does not believe that the Fifth Circuit would have directed it to make a "factual determination of the amount of damages" had it meant this court merely to perform the ministerial duty of writing down the damage amount Barrett requested at trial.

6. The statute provides for an award of $1000.00 for each act of disclosure. Because out of the 386 circular letters, 126 were returned to the IRS without delivery, the maximum number delivered was 260.

Barrett saw from 1986 to 1988, and there is no dispute that the letters were sent to 260 patients, there is little but speculation to support the conclusion that the decline was caused by the letters. Although the United States did not put on any independent evidence to support its contention that there were no actual damages from the letters, the masterful cross examination of Barrett's witnesses exposed the serious lack of evidentiary support for Barrett's contention that actual damages were caused by the communication in the letters that Barrett was under criminal investigation.

Barrett's first witness on actual damages was Frederick M. Pevow, an ear, nose, and throat specialist. He was the only witness who had been Barrett's patient and had received a copy of Hanson's letter. (Tr. pp 456–60) He testified that when he read the letter, he received the impression that Barrett was a "tax cheat." This notion upset Pevow because Pevow pays his taxes. His second thought, he testified, was "where did the Government get my name to be sending me a letter. They obviously must have gone through records somewhere...." The letter embarrassed him. (Tr. pp. 459–60) There was no evidence from Pevow that his feelings upon reading the letter caused him to fail to return to Barrett for further medical treatment or to fail to refer patients to Barrett. Had there been such evidence, Barrett would have been obliged to show that the failure to return or refer was caused by his first reaction to the letter, not the second.

Dr. Thomas Morgan Biggs (Tr. pp. 558–603) is a licensed physician with a specialty in plastic surgery. He testified that he sees 1,000 patients every year and that a plastic surgeon like Barrett could easily see 600 patients per year. Biggs also testified that patient referrals are the most significant form of repeat business and repeat business is significant to a plastic surgeon's business.

Biggs also testified that, although he did not have "expert knowledge as such," he did "have a concept based on [his] experience as to why people go to some [plastic surgeons] and not to others." (Tr. 565). Biggs testified on *voir dire* in aid of a defense objection that he had never testified as an expert on the subject and had never conducted any formal or informal research on the subject. He based his opinions on the effect on a plastic surgeon's practice of having letters such as these mailed to his patients upon his "very strong feelings." The United States objected to any expert testimony from this witness based upon Rule 702 of the Federal Rules of Evidence because Biggs had no specialized knowledge that would assist the trier of fact to understand the evidence. The court allowed Biggs to express his opinion that the letters had "a severe detrimental effect on the growth of Barrett's practice" (Tr. 571) because the testimony was given in a bench trial at which the trier of fact could disregard the testimony if it was not probative.

On cross examination, Biggs was asked, "So your testimony that it would have a devastating, severe detrimental effect on the growth of [Barrett's] practice is just speculation, isn't that right?" Biggs answered, "That's my feeling, based on my experience with patients and why patients choose physicians." (Tr. 584) Biggs acknowledged that he had not contacted any of the patients to whom the letter was sent in order to determine if any had decided not to see Barrett because of the information in the letter. He also acknowledged that he had not discussed with Barrett the reaction of any specific individual patient to the letter. (Tr. pp 584–585). Because Biggs's "expert" opinion testimony that the letters had "a severe detrimental effect on the growth of Barrett's practice" is based purely upon Biggs' speculation, the court has disregarded it. (Tr. 571)

Biggs also testified that there was a "black cloud" hanging over Barrett's career created by the circumstances surrounding Barrett's failure to be admitted to the American Association of Plastic Surgeons, a selective organization of plastic surgeons, at some point after the circular letters had been sent. Biggs was serving on the membership committee at that time. At trial Biggs testified that before the membership committee meeting, he had heard unspecified rumors of problems Barrett had had with the IRS, and at the meeting he became aware that the entire committee had also heard these ru-

mors. During the meeting a list of lawsuits in which Barrett was involved was presented to the committee anonymously. Among the lawsuits listed was a lawsuit involving Barrett against the IRS. Biggs testified that at that point Barrett's membership in the committee was "tabled." On cross Biggs was confronted with his deposition testimony that he had become aware of the "problems with the IRS" only after he saw the list of lawsuits, one of which involved Barrett and the IRS. He also acknowledged that he had not seen the IRS letter before the meeting; in fact he only saw the letter shortly before he gave his trial testimony. Although much time was spent developing this testimony, it was probative only to the irrelevant issue of harm caused to Barrett or his practice from the fact that the IRS was conducting an investigation, not to the issue of damages caused by disclosure of the contents of the circular letters. The key point is that the matter of Barrett's American Association of Plastic Surgeons membership was never connected to the circular letters or to Barrett's patients. Rather, it served only to show that Barrett's fellow physicians were aware, independent of the letters, that Barrett was in a battle with the IRS.

Biggs testified that he would not hesitate to refer patients to Barrett. (Tr. 582) He gave no evidence that he knew of any other doctor who had not referred patients to Barrett because of the letters.

Biggs was testifying as a friend and colleague of Barrett. His testimony on direct was speculative and on cross, was evasive; his testimony was not credible on both the membership and infidelity issues (Tr. 576–580, 599–600). The trier of fact has given it little if any consideration.

Dr. Denton Cooley, the world famous cardiac surgeon, testified that he has known Barrett 15–20 years. He has referred patients to Barrett for 10–15 years. Barrett has performed surgery on both Cooley and his wife. He did not recall when he became aware of the IRS letter, but he recalls Barrett's being "very upset, very irritated and distraught over the fact." He also recalled seeing in the newspaper an article about Barrett's being under criminal investigation.

(Tr. 605) Cooley's testimony was not clear as to whether Barrett was upset with the circular letters being received by his patients or by his being investigated by the IRS.

When asked about Barrett's reputation as a plastic surgeon in March, 1983, Cooley testified that it was "quite good," (Tr. 605) and that since March of 1983, he testified, "I think it took a definite dip after this news become [sic] widely distributed, not only with his patients, but with the general public and also with the medical profession, the doctors who had referred patients to him." (Tr. 606) He also testified that there was nothing in Barrett's performance as a plastic surgeon that would have caused the dip. Cooley was asked on direct, "do you recall specifically what any indications of that dip are that you are familiar with?" His response was, "Well, I can only relate it to that one incident, the fact that he was under criminal investigation, and that caused concern to his patients, to doctors who refer patients to him. It was a real smear on his reputation." (Tr. 605–606) Again, there is no distinction made between the fact of the criminal investigation and the receipt by patients of the knowledge that Barrett was under criminal investigation in the circular letters.

On cross Cooley admitted that he was testifying for Barrett because they are friends. He was also thoroughly impeached by his deposition testimony that before March, 1983, Barrett's reputation as a surgeon had always been good and that Cooley "cannot say" that Barrett's "professional reputation in the community" had changed since then. Cooley also testified in his deposition, "I have no evidence that it has changed, and certainly I can't recall any particular episode that may have changed it." (Tr. 609) Cooley further testified in his deposition that before March, 1983, Barrett's reputation as a surgeon was good and that Cooley would not have allowed Barrett to operate on Cooley and his wife had it not been good. When asked on deposition whether that reputation had changed since March, 1983, Cooley's answer was "not that I can say." He was also asked in his deposition whether he knew of any doctors who had refused to refer patients to Barrett because they knew he was

under investigation by the IRS, and Cooley responded, "No." (Tr. 609–610) Cooley admitted on cross that Barrett had not identified any particular patients who Barrett believed had stopped seeing him because they got the letter. (Tr. 610)

Finally, Cooley confirmed on cross that he sees quite. a few patients from Mexico and had noticed that since the early 1980's the devaluation of the peso had an effect on his income from patients from Mexico: "Well, my practice has diminished considerably since the peso has become almost valueless. . . . The patients can't afford to come." (Tr. 610–611)

Barrett's own testimony began with a recitation of the many items on a distinguished *curriculum vita:* honors received, teaching positions, publications, etc. (Tr. 998–1002) These would not appear to belong to a physician whose reputation had been ruined. He testified that after the circular letters were mailed, he and his office staff spent many hours staying overtime reassuring "upset and embarrassed . . ., outraged patients" who had received the letters. Because his testimony would have constituted hearsay, Barrett was not allowed to testify to what precisely these patients were embarrassed about, but from Barrett's previous and subsequent testimony that his patients guarded their privacy, it can reasonably be concluded that the patients' perceived violation of their privacy was a substantial cause of the outrage, not the disclosure of a criminal investigation. (Tr. 1030–1039)

Barrett further testified that "[A]fter Mr. Hanson sent the letters to my patients, my practice dropped significantly. I was not seeing nearly the number of patients I used to see prior to Mr. Hanson's letters going out." (Tr. 1040) He also testified that he normally acquires the majority of his new patients through referrals by other patients and that he "experienced a reluctance of those patients who received this letter to refer their friends or their colleagues for

surgery or treatment by me." (Tr. 1040). Eventually he admitted on cross, however, that he has never identified "one patient who has refused to see you or stopped seeing you because they got one of these letters," and that he had not attempted to contact any patient to ask if the patient did not intend to return because of the letters. (Tr. 1067)

Barrett also testified that the prominence of certain of his patients to whom the letters were sent caused him harm because "patients or potential patients tend to look to leaders, those perceived to be leaders, for advice and for recommendations." Barrett testified that a prominent patient who received the IRS letter and decided not to refer patients to him "could result in hundreds if not thousands of patients the I am not seeing." (Tr. 1044) Barrett then embarked upon page after page of testimony concerning the "prominent patients" who were on the list of 260 patients to whom the circular letters were sent. (Tr. 1044–1057) Significantly, not one of these individuals was called to testify that he or she had not referred patients to Barrett because he or she learned in a letter from the IRS that Barrett was under criminal investigation.[7]

In summation Barrett testified on direct that the letters caused him "tremendous pain, tremendous suffering, humiliation, embarrassment, financial loss, and have been, I'm sure in the history of my life I'm sure if I live to be 100 they would, this would be perhaps the worst thing that ever happened to me, or could happen to anyone, could probably—I cannot think of anything worse that could have happened to anyone." (Tr. 1059–60)

On cross examination Barrett confirmed that his associate, Dr. Rose, knowing about the IRS investigation and the letters, had started working with him in 1984, after the letters were mailed, because Barrett "had the best profile and best cosmetic practice in Houston." (Tr. 1061–1064) [8]

---

7. It can be inferred from Barrett's testimony that some of these prominent patients were concerned that their privacy had been breached, but not that they thought Barrett was "a criminal."

8. Although the transcript indicates that Dr. Barrett disagreed with that statement from Dr. Rose's deposition, the context clearly indicates that the "disagree" in the transcript should be "agree."

Barrett also acknowledged that he could not identify any doctors who had declined to refer patients to him or had declined to associate with him as a result of the disclosures in the letters and that no surgical privileges were denied or suspended because of the letters. He also admitted that his visits to a psychiatrist in 1987 were because of marital difficulties. One of Barrett's patients underwent surgery and substantial treatment from Barrett *after* she received the IRS letter. (Tr. 1089)

Government's Exhibit 8 was a summary of the income reported on Barrett's federal income tax return for the years 1978–1988. That summary revealed that in 1983, the year the letters were sent, Barrett's income was higher than his income from the year before. Each year from 1983 until 1987 his income from his medical practice increased. There was a dip in income in 1987, but in 1988 it went up again. (Tr. 1080–81) By 1987 Barrett was wealthy enough to commission a mural for his pool house; the party given to unveil the mural was the subject of an article in the society column of a Houston newspaper. The mural itself was the subject of a feature article in the Sunday edition of the newspaper. (Tr. 1085–86)

Barrett was obviously an interested witness who tended to exaggerate the importance of some of his patients as well the anguish he suffered because of the circular letters. Throughout his cross, Barrett's testimony was argumentative, evasive and non-responsive. These responses coupled with his general demeanor made him less than a completely credible witness. Given Barrett's circumstances, including his legal battles with the IRS, it is unclear from his testimony whether his anguish derived from the letters or because he was under investigation by the IRS.[9]

The final damage witness was Karl M. Johnson, a certified public accountant and tax partner at Peat Marwick. His credentials consisted of an involvement in individual taxation, financial planning, and fiduciary tax and estate tax matters. He testified that he did a great deal of tax controversy work, primarily in the estate planning area. He was also involved in the litigation support group in Houston dealing with a variety of litigation services. (Tr. 2093–94) He considered the Barrett case "a unique situation," because he had never done "a precise analysis of lost income by a physician due to improper disclosures by the IRS prior to this case." (Tr. 1095–96) He was not a certified appraiser, and he did not perform an appraisal of the value of Barrett's practice. What he did was a "lost income model," which he described as "a model designed to illustrate what would have happened to Doctor Barrett's practice had this incident regarding the Internal Revenue Service not occurred." (Tr. 1095)

On *voir dire* in aid of a defense objection, Johnson testified that he had had only one course in valuation outside college, in the early 1980's. He admitted that in one vital component of the analysis he had had to consult someone else in order to arrive at his opinion.

Johnson also admitted that he had conducted no formal or informal research on the subject of why patients decide to see or not to see doctors. He stated that his professional opinion concerning why patients see doctors was based on his experience of why clients see accountants. (Tr. 1099) Nevertheless, he testified that he was not qualified to answer the question, "if an accounting firm was under criminal investigation by the Internal Revenue Service they would have a lot more detrimental effect on their practice than if a doctor was under criminal investigation by the Internal Revenue Service?" (Tr. 1099)

Johnson had never testified or been hired, other than in this case, to state an opinion on why patients see doctors or do not see doctors. He stated it was beyond the scope of his engagement as an expert witness to contact any of the patients who got one of the circular letters, and he did not do so. (Tr. 1100) Nor had he read any literature of any sort on why patients choose to see a particular doctor. His preliminary report was done

9. Barrett based his entire damage claim on Karl M. Johnson's economic analysis of lost income; he has neither proven nor quantified any other types of damage.

in August, 1989 and his deposition was taken in October, 1989. Between that time and the time of trial, he had run a more sophisticated computer model for computing interest, but the basic methodology he used in his analysis had not changed. At the time of his deposition he testified that he took causation of the damages as a given. (Tr. 1101)

The United States objected to Johnson's testimony as an expert both because he was unqualified and because under Rule 702 the fact finder did not need an expert on causation. Again, the court heard the testimony because the trial was to the court, who could disregard the evidence if it was improper or not probative.

Johnson reached an expert opinion that Barrett had sustained actual damages of approximately $8.6 million as result of the mailing of the circular letters. (Tr. 1106) Essentially, Johnson calculated how many additional patients Barrett should have been seeing annually (300) and the average charge to each patient ($1700), multiplied it out for 21 years [10], discounted for certain risk and return on investment factors and reached a number.

Johnson disagreed with the United States' evidence that Barrett had not been damaged at all because his income had steadily increased until he was a wealthy man, because Government's Exhibit 8 represented not just the amounts that Barrett received as a provider of medical services, but, in addition, compensation received as a director or shareholder of Barrett's two professional associations and a management fee for services to the partnership with Dr. Rose.[11] (Tr. 1109–1110)

Johnson testified that, based upon his analysis of the patients' ledger cards, the number of patients Barrett was seeing, was increasing at a "very dramatic rate" when there was a sudden drop. (Tr. 1123) He also testified

that there was no effect, other than the inflation rate, on Barrett's practice as a result of Houston's economic conditions.

On cross the attorney for the United States destroyed the notion of a dramatic increase in patients prior to 1983. Johnson conceded that the number of patients Barrett saw decreased from 1978 to 1979, increased from 1979 to 1980, and decreased from 1980 to 1981. (Tr. 1129). In 1982, the last full year before the letters were sent, Barrett saw approximately 400 patients.[12] The number of patients he saw increased until they peaked in 1984 at approximately 505. After the peak, the number of patients seen began to decline, but it was not until 1987 that Barrett saw fewer patients than he saw in 1982, the last full year before the letters were sent. (Tr. 1129–1132)

Johnson was asked on cross whether there were not other potential factors that could have caused a drop in patients for elective cosmetic surgery, such as the effect of the drastic decrease in the price of crude oil on the local Houston economy and the devaluation of the Mexican peso. He testified that he took both into account, but did not make a direct correlation between those events and the dip in patients experienced by Barrett in 1986. His methodology did not attempt to distinguish different causes, including problems in Barrett's personal life. (Tr. 1132–1136)

Johnson's expert conclusions suffer from two serious flaws. The first was in the data. Taken as a whole there may have been an increase in patients from 1978 to 1983, but, when reviewed on a yearly basis, the kind of dramatic increase in patients the witness testified to was simply not there. The second flaw was in causation evidence. Johnson took as a given that Barrett saw 410 patients in 1986 and 310 patients in 1987 because of a

10. The number of years Barrett had then left until retirement age 65.

11. There was no evidence to establish how much time Barrett spent on these extra-medical tasks or whether this time cut into his time available for treating patients.

12. Reading the graph, Plaintiff's Exhibit 85, it appears that Barrett's patient numbers were as follows:

| 1982 | 390 |
| 1983 | 435 |
| 1984 | 505 |
| 1095 | 448 |
| 1986 | 410 |
| 1987 | 310 |

delayed reaction caused by the circular letters sent in 1983. There is no credible evidence to establish this. Most obvious is that the length of delay attenuated and made unlikely any causation link. Johnson's conclusions are based upon speculation that patients were so concerned upon learning from the letters that their plastic surgeon was the subject of an IRS criminal investigation that they would fail to return to be treated by him and would not refer their friends and colleagues to him for treatment and the further speculation that the results of this concern would manifest itself two years later. There was no explanation as to why the delay in reaction was so lengthy.

Nor was there testimony by Johnson or anyone else to determine if any of the 260 patients had in fact failed to return or to refer friends and colleagues to Barrett because they thought he might be a "tax cheat" or had failed to return or to make such references because they thought he had violated their desire for privacy. Considering the doctors' testimony in its totality, the court concludes that it is far more likely that the patients were upset with Barrett because they thought he had violated their privacy interests than because they may have thought the letter branded him as a "tax cheat."

Johnson made no attempt to differentiate the damage that he maintained was caused by the improper disclosure in the circular letters from the damage that the many other factors that could have contributed to a drop in the number of Barrett's patients. These factors included the fall in the value of the Mexican peso, in the mid to late 1980's, which would have hindered patients from Mexico in seeking plastic surgery in Houston, and the severe drop in the price of crude oil during this period, which had a profound economic impact on Houstonians and Texans seeking elective plastic surgery. Nor did Johnson take into account the fact that any potential patients who may have thought Barrett was a "tax cheat" may have gained the information from newspaper accounts of Barrett's

battles with the IRS. Johnson did not take into consideration the fact that Barrett was experiencing serious personal problems during the mid to late 1980's that could have caused a drop in the number of patients, not only because, given the nature of those problems,[13] his personal reputation may have suffered, but also because he may not have wished to take on additional patients.

The evidence clearly indicates that Barrett's income had steadily increased each year since 1978[14] until he was a wealthy man with an interest in two medical professional associations and a newsworthy mural in his poolhouse. There are many possible explanations for why the number of Barrett's patients had levelled off to a point below the number he had treated in 1982. It is likely that the decrease in patients was a result of a combination of factors, the most unlikely of which, given the totality of the evidence, was the disclosure in the IRS letter. Why Barrett's patients decreased is a question that may not be answerable. From a preponderance of the evidence brought forward in this trial, it was not answered here. Barrett has failed to prove that he suffered actual damages in this case.

■ The Fifth Circuit found that the IRS violated Barrett's rights, and that he is entitled to damages. Barrett has failed to prove actual damages from the disclosures, but there is no question that the legislative purpose of the confidentiality provisions of § 6303 is to protect the reputation of the taxpayers who are under audit or investigation, and § 7431 provides for a situation in which there are no actual damages proved. Barrett is entitled to recover statutory damages in the amount of $260,000. 26 U.S.C. § 7431(c)(1)(A).

Barrett maintains that he is entitled to an award of punitive damages under 26 U.S.C. § 7431(c)(1)(B) because the Fifth Circuit stated in a footnote at the very end of the case that Hanson's testimony in a previous proceeding that he thought "Dr. Barrett's patients who had undergone plastic or recon-

13. Cf. the testimony taken in camera of Barrett and Biggs and Defendant's Exhibit 9 filed and maintained under seal.

14. Barrett's income increased from 1978 until 1987 when it decreased and then came up again.

structive surgery would be embarrassed, humiliated, or otherwise distressed by receiving the letters which would harm Dr. Barrett's relationship with his patients" was evidence "indicative of Agent Hanson's willfulness or gross negligence." *Id.* n. 6. Significantly, however, the evidence is concerned with the damage inherent in the receipt of a letter that would make known to the recipient that the sender was aware that the recipient had received plastic or reconstructive surgery. As has been pointed out, the sending of the letter, as distinguished from the content of the letter, was not found to be an unlawful disclosure. The Fifth Circuit's *dicta* in this footnote must be a comment on Hanson's failure to follow procedures in drafting the content of the letter and having that content approved and not on the wisdom of Hanson's decision to send circular letters, which was properly approved by his superior. This court does not believe that the Fifth Circuit, by dropping this footnote at the very end of its decision, meant to foreclose a factual determination of whether Hanson's actions were "willful or grossly negligent" for purposes of determining punitive damages.

■ Barrett is not entitled to recover punitive damages for two reasons. First, the disclosures were not willful or grossly negligent. Specifically, Hanson stated in the body of the letters that Barrett, "is currently under investigation by the Criminal Investigation Division of the Internal Revenue Service." Section 347.2 of the Handbook recommended that the letters state that, "the Internal Revenue Service is conducting an investigation of" the taxpayer, and recommended that the special agent place the words "Criminal Investigation Division" in the signature block, beneath his name and title. *Cf., e.g., Marré v. United States,* 38 F.3d 823, 826–27 (5th Cir.1994). Section 6103(k)(6) gives an IRS agent the discretion to "disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available." As has already been stated, the Fifth Circuit did not overturn this court's finding that the information sought by Hanson through the mailings was "not otherwise reasonably available." The issue of willfulness or gross negligence turns on whether, in 1983, Hanson had grounds for believing that § 6103(k)(6) authorized him to disclose in the body of the letter, instead of in the signature block, as prescribed by § 347.2, the fact that the investigation was being conducted by the Criminal Investigation Division. Barrett argues that the same evidence he used to convince the Fifth Circuit that Hanson was acting in bad faith when he made the disclosure, i.e., Hanson's admitted knowledge beforehand of the confidential relationship between the doctor and his patients, Hanson's knowledge that the letters would cause the patients embarrassment, humiliation and emotional distress, and Hanson's failure to provide an explanation for his complete failure to follow the mandates of Chapter 347.2, which requires written approval of content as well as the use of circular letters from the Chief of C.I.D. and mandates that he not injure the reputation of the taxpayer under investigation, also establish willfulness and gross negligence. Although the Fifth Circuit held that Hanson was not acting in good faith by failing to familiarize himself with the applicable statutes and in failing to follow the forms and procedures set forth for a circular letter in the Agents' Handbook such a finding cannot alone support a second finding of willfulness or gross negligence. There must be something more. An IRS Special Agent in 1983 could reasonably believe that he was authorized to disclose, beneath his name in the signature block of a circular letter, that he worked for the "Criminal Investigation Division" of the Internal Revenue Service since that is the format suggested by Section 347.2 of the Handbook for Special Agents. *Cf. Diamond v. United States,* 944 F.2d 431 (8th Cir.1991). Barrett's IRS expert, Carlton R. Boswell, testified that a Special Agent doing a criminal investigation was required to display his credentials identifying himself as a special agent with the Criminal Investigation division of the Internal Revenue Service to persons being interviewed, and that it would be misleading for a special agent not to disclose his identity and the nature of the investigation at the outset of an interview with a third-party witness. (Tr. 833–834, 842–843) The use of the words

**504**

"Criminal Investigation Division" in the body of the otherwise plain vanilla circular letters Hanson sent in 1983 cannot be deemed so flagrant a violation of § 6103 that it rises to the level of willful or grossly negligent so as to warrant a punitive damage award, especially in light of the Marré case, in which the Agent's disclosures were far more numerous and egregious than Hanson's. In that case the Fifth Circuit found that those disclosures did not warrant punitive damages. *Marré*, 38 F.3d at 826–827.

■ The second reason why an award of punitive damages is improper is that the clear statutory language of Section 7431(c) precludes the award of punitive damages in a case in which actual damages have not been shown. Section 7431(c) reads:

> (c) Damages—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—
>
> (1) the greater of—
>
> (A) $1,000 for each act of unauthorized disclosure of a return or return information with respect to which such defendant is found liable, or
>
> (B) the sum of—
>
> (i) the actual damages sustained by the plaintiff as a result of such unauthorized disclosure, plus
>
> (ii) in the case of a willful disclosure or a disclosure which is the
>
> result of gross negligence, punitive damages plus
>
> (2) the costs of action

The very language and structure of the statute, the coupling of actual and punitive damages under subpart (1)(B) and failure of the statutory damages subpart, (1)(A), to mention punitive damages, would, logically, mean that punitive damages are recoverable only when actual damages have been proved. *Smith v. United States*, 730 F.Supp. 948, 955 (C.D.Ill.1990), *rev'd on other grounds*, 964 F.2d 630 (7th Cir.1992).[15] This interpretation of the statute is consistent with the

common law tort rule that punitive damages may not be awarded in the absence of actual damages. *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281 (5th Cir.1991); *Guaranty Service Corp. v. American Employers' Ins. Co.*, 893 F.2d 725 (5th Cir.1990), *op. modified on rehearing in part*, 898 F.2d 453 (5th Cir. 1990); *Alcorn County, Miss. v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1170 (5th Cir.1984).

In conclusion, this court finds that, for the reasons expressed in the foregoing, Barrett has failed to prove actual damages. He is entitled to receive statutory damages only, in the amount of $260,000.00, pursuant to 26 U.S.C. § 7431(c)(1)(A), and he is not entitled to receive punitive damages.

---

**15.** This court is aware that the Fourth Circuit in *Mallas v. United States*, 993 F.2d 1111, 1125–26 (4th Cir.1993) has held to the contrary in award-ing punitive damages under § 7431 where no actual damages were awarded.