United States Court of Appeals,

Fifth Circuit.

No. 95-21066.

Bernard M. BARRETT, Jr., M.D.;  Plastic & Reconstructive
Surgeons, P.A., Plaintiffs-Appellants,

v.

UNITED STATES of America, et al., Defendants,

UNITED STATES of America, Defendant-Appellee.

Nov. 27, 1996.

Appeal from the United States District Court for the Southern
District of Texas.

Before POLITZ, Chief Judge, and SMITH and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Plaintiffs-Appellants Bernard M. Barrett, Jr., M.D., and
Plastic and Reconstructive Surgeons, P.A., appeal the district
court's judgment denying them actual and punitive damages for the
unauthorized disclosure by the Internal Revenue Service of certain
return information in violation of 26 U.S.C. §§ 6103(k) and
7431(b).  The court held that Appellants had demonstrated neither
that they suffered harm as a result of the unauthorized disclosure
nor that the conduct of the IRS was willful or grossly negligent so
as to justify an award of punitive damages.  Alternatively, the
court held that even if Appellants had made the requisite showing
for punitive damages, the plain language and structure of 26 U.S.C.
§ 7431(c) prohibits their award in the absence of actual damages.
Insofar as we affirm the court's decision that Appellants failed to

1

prove actual damages under 26 U.S.C. § 7431(c)(1)(B)(i) and punitive damages under 26 U.S.C. § 7431(c)(1)(B)(ii), it is unnecessary to resolve the statutory interpretation issue whether 26 U.S.C. § 7431(c) authorizes an award of punitive damages where actual damages have not been shown.

## I. FACTS[1]

The saga of Dr. Barrett continues.[2] Bernard M. Barrett, Jr., M.D. is the president and sole owner of Plastic & Reconstructive Surgeons, P.A. ("PARS"). In 1979, the Internal Revenue Service began an audit of Dr. Barrett's personal and corporate tax returns for the years 1976, 1977, and 1978. When the initial investigation revealed a discrepancy of $100,000 between Dr. Barrett's books and his bank records, the IRS transferred the case from its civil division to its Criminal Investigation Division ("CID") under the care of Special Agent Michael O. Hanson.

After two informants told the IRS that Dr. Barrett did not

---

[1]These facts are substantially taken from the panel opinion in *Barrett v. United States,* 51 F.3d 475 (5th Cir.1995).

[2]*See e.g., Barrett v. United States,* 917 F.Supp. 493 (S.D.Tex.1995) (denying actual and punitive damages, from which this appeal is taken); *Barrett v. United States,* 51 F.3d 475 (5th Cir.1995) (holding that disclosures of return information in circular letters mailed to plaintiff's patients violated 26 U.S.C. § 6301); *United States v. Barrett,* 837 F.2d 1341 (5th Cir.1988), *cert. denied, Barrett v. United States,* 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989); *United States v. Barrett,* 804 F.2d 1376 (5th Cir.1986); *Barrett v. United States,* 795 F.2d 446 (5th Cir.1986); *United States v. Barrett,* 787 F.2d 958 (5th Cir.1986); *United States v. Texas Heart Inst.,* 755 F.2d 469 (5th Cir.1985).

accurately report all cash payments received from his patients,[3] Agent Hanson sent a summons to PARS seeking its patient ledger cards and other business records. When Dr. Barrett responded that PARS would not comply with the summons, Agent Hanson thought it necessary to inquire of Dr. Barrett's patients the amount each had paid for Dr. Barrett's services and whether any part had been paid in cash. He therefore sent summonses to the hospitals where Dr. Barrett performed surgery and one to Dr. Barrett individually to obtain Dr. Barrett's patient lists. All but four of the sixteen hospitals complied, providing Agent Hanson with a list of 386 names and addresses of Dr. Barrett's patients.

Agent Hanson then sent a "circular letter" to each of those patients, disclosing Dr. Barrett's name and address, informing them in the text of his letter that Dr. Barrett was being investigated by the Criminal Investigation Division of the IRS, requesting information about the nature and amount of fees paid to Dr. Barrett, and identifying himself in the signature block as a Special Agent with the Criminal Investigation Division. One-hundred twenty-six letters were returned as undeliverable, leaving 260 letters outstanding.

In November, 1983, Dr. Barrett commenced this action against

---

[3]In the 1989 joint pretrial order, the IRS admitted and Agent Hanson testified that Dr. Barrett was no longer the target of any criminal investigation involving either the IRS or Agent Hanson and that Dr. Barrett had never been charged or indicted as a result of the IRS criminal investigation.

the United States, alleging the circular letters unlawfully disclosed tax return information in violation of 26 U.S.C. §§ 6103 and 7431 of the Internal Revenue Code ("Code").[4] A panel of this Court agreed and remanded the case to the district court for a determination of damages. *Barrett v. United States,* 51 F.3d 475, 480 (5th Cir.1995) ("*Barrett I* "). On remand, the district court found that Dr. Barrett had failed to prove he suffered actual damages from the unlawful disclosure. *Barrett v. United States,* 917 F.Supp. 493, 502 (S.D.Tex.1995) ("*Barrett II* "). The court then rejected Dr. Barrett's request under Code § 7431(c)(1)(B)(ii) for punitive damages, finding that the IRS did not act willfully or with gross negligence in disclosing that Dr. Barrett was under criminal investigation. *Id.* at 504. The court held alternatively that even if Dr. Barrett had proved willfulness or gross negligence, Code § 7431(c) barred an award of punitive damages in the absence of actual damages. *Id.* Accordingly, the court awarded Dr. Barrett only statutory damages pursuant to Code § 7431(c)(1)(A) in the amount of $260,000, plus costs. *Id.* Dr. Barrett now appeals. He argues that the district court, by failing to award either actual or punitive damages under Code § 7431(c)(1)(B), violated the law of the case, as he interprets it, of *Barrett I.*

## II. STANDARD OF REVIEW

---

[4]It is undisputed that the disclosure of the IRS's criminal investigation of the tax returns of Dr. Barrett and PARS is return information. Code § 6103(b).

4

The district court's findings that Dr. Barrett failed to establish under Code § 7431(c)(1)(B) actual and punitive damages arising from Agent Hanson's unlawful disclosure are findings of fact subject to reversal only upon clear error. A finding is clearly erroneous only when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Fed.R.Civ.P. 52(a); *see also United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948).

Dr. Barrett would have us review the district court's holdings *de novo,* arguing that the court violated the law of the case doctrine in rejecting his evidence on the actual and punitive damages claims. We cannot accept this invitation.

Dr. Barrett holds the erroneous belief that our opinion in *Barrett I* directs the district court on remand to find for Dr. Barrett in the very amount of actual and punitive damages he requests. In support of his reading, he points to our language in *Barrett I* remanding the case to the district court, in which we state:

> Because the district court erred in concluding that the IRS was not liable, it made no findings on the issue of Dr. Barrett's damages. We acknowledge that Dr. Barrett presented uncontradicted evidence of his damages during trial, and he urges this Court to assess damages. We believe, however, that the trial level is the appropriate site for the factual determination of the amount of damages to be awarded to Dr. Barrett as a result of Agent Hanson's mailing of the circular letters. Accordingly, we REVERSE the judgment of the district court and REMAND for a determination of damages.

5

*Barrett I,* 51 F.3d at 480.  Dr. Barrett argues that this language makes both the causation between the unlawful disclosures and his loss of business and the amount of damages foregone conclusions. For the district court to hold otherwise, he complains, violates the law of the case doctrine.

Dr. Barrett is incorrect.  While we recognize the ambiguity of the above-quoted language, taken in the context of our whole opinion, it cannot be construed as Dr. Barrett reads it.  The entirety of our opinion focuses exclusively on the liability phase of the action;  nowhere do we discuss the merits of Dr. Barrett's actual and punitive damages claims.  Our statements acknowledging "that Dr. Barrett presented uncontradicted evidence of his damages during trial," *id.,* and remanding to the district court for a "determination of the *amount* of damages to be awarded," *id.* (emphasis added), do not, contrary to Dr. Barrett's assertion, reflect a decision on our part holding that Dr. Barrett has factually *proven* either actual or punitive damages.  Our first statement simply reflects our finding that *only* Dr. Barrett, and not the United States, has presented damage evidence;  whether this evidence in turn is sufficiently credible to justify an award of actual or punitive damages is a determination we appropriately left to the district court on remand.

Our second statement, although an acknowledgment of the propriety of *some* damages, is not *ipso facto* a comment on the

6

propriety of actual and punitive damages themselves. We read, and believe the panel in *Barrett I* intended, the phrase "amount of damages" to authorize the district court to award either statutory damages pursuant to Code § 7431(c)(1)(A) or actual or punitive damages pursuant to Code § 7431(c)(1)(B), whichever the court on remand, after a thorough review of the damage evidence, found appropriate. In other words, we concluded in *Barrett I* that Dr. Barrett is entitled to *some* damages; whether they be statutory, actual, or punitive damages is a factual determination that only the district court is competent to make.

The law of the case, therefore, established in *Barrett I* holds only that the United States is liable to Dr. Barrett and PARS for some damages for the unlawful disclosures of return information; significantly, it does not also specify the type of damages to which Dr. Barrett is entitled. Rather than expressing an opinion on that issue, we specifically left that factual determination to the district court. Any other reading, as the district court points out, is nonsensical; we would not have directed the district court to make a "factual determination of the amount of damages" had we meant it "merely to perform the ministerial duty of writing down the damage amount Barrett requested at trial." *Barrett II,* 917 F.Supp. at 496 n. 5. On appeal, therefore, are the court's factual determinations of damages. Our review is thus appropriately circumscribed by the "clearly erroneous" standard.

7

## III. ANALYSIS

Code § 6103(a) provides that tax "[r]eturns and return information shall be confidential" and may not be disclosed "except as authorized by [the Code]." Return information includes the fact that a taxpayer is under investigation. Code § 6103(b)(2)(A). Code § 6103(k)(6) excepts from this general rule return information disclosed to third parties to obtain information relating to any civil or criminal tax investigation "to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available." Liability for unauthorized disclosures does not attach, however, if the disclosure "results from a good faith, but erroneous interpretation of section 6103." Code § 7431(b).

Once liability attaches, a court must make a determination of damages consonant with Code § 7431(c), which states:

> [U]pon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—
>
> (1) the greater of—
>
> (A) $1,000 for each act of unauthorized disclosure of a return or return information with respect to which such defendant is found liable, or
>
> (B) the sum of--
>
> (i) the actual damages sustained by the plaintiff as a result of such unauthorized disclosure, plus
>
> (ii) in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages, plus

8

        (2) the costs of the action.

This appeal concerns only the damage phase of the action.

*A. Actual Damages*

        Dr. Barrett seeks at least $8,629,208.00 in compensatory damages, arguing that but for the circular letters, he would not have suffered as great a loss as he did in his surgery practice. Emphasizing our previous statement that his evidence on damages was "uncontradicted" at trial, *Barrett I,* 51 F.3d at 480, Dr. Barrett disputes the district court's subsequent failure to award actual damages on remand as clearly erroneous. The United States maintains that Dr. Barrett did not suffer any economic loss as a result of the disclosure, pointing out that Dr. Barrett's damage evidence at trial was not "uncontradicted" insofar as the United States thoroughly discredited it during cross examination.[5]

        Before discussing the merits, we must once again address Dr. Barrett's contention that the district court's opinion emasculates the rule of law established in *Barrett I.* He rejects the court's premise for denying actual and punitive damages as based upon a fallacious reading of our opinion in *Barrett I.* Dr. Barrett's accusation lacks justification. The district court correctly discerned that opinion to hold that the IRS had violated Code §§

---

        [5]The United States accepts the court's finding awarding Dr. Barrett $260,000 in statutory damages pursuant to Code § 7431(c)(1)(A), which provides $1,000.00 for each act of disclosure.

9

6103 and 7431 not by *mailing* the circular letters but by unnecessarily and in bad faith *disclosing* in the body of those letters the criminal investigation. This distinction is significant, as the court in *Barrett II* emphasized, because a violation occasioned by the *mailing* of the letters obliges Dr. Barrett to prove his lost business arose from his patients' concerns about breach of privacy issues whereas a violation occasioned by the *disclosure* of the criminal investigation obliges him to prove he lost business because his patients thought him a "tax cheat." Insofar as this Court in *Barrett I* did not dispute the wisdom of Agent Hanson's decision to use the circular letters to obtain the payment data, the district court in *Barrett II* correctly recognized that the privacy interests of Dr. Barrett's patients would have been implicated whether or not the disclosures had been made.[6] The court therefore properly concluded that, "any

_____

[6]Dr. Barrett is of the remarkable opinion that this Court in *Barrett I* expressly held that liability attaches to the United States for the very use of the circular letters themselves. He directs us to various statements in our discussion, where we address the facts that "Agent Hanson *sent* a "circular letter,' " *Barrett I,* 51 F.3d at 477 (emphasis added); that he testified about his failure to follow established procedures "when he *prepared and mailed* out the letters," *id.* at 480 (emphasis added); and that we remanded for a factual determination of damages to be awarded "*as a result of Agent Hanson's mailing of the circular letters.*" *Id.* (emphasis added).

Dr. Barrett reads these statements in a vacuum, thus ignoring the full import of our decision. Our opinion in *Barrett I* resolved only that the United States was liable because it had acted in bad faith in making disclosures that

10

actual damages must have arisen from the disclosure to the patients of the criminal investigation itself and not from the concern of the patients that their privacy had been breached." *Barrett II*, 917 F.Supp. at 496. Even were we to concede, though in no way should our opinion be understood to do so, Dr. Barrett's point that actual damages need arise only out of breach of privacy concerns, we still cannot hold the district court's conclusion rejecting actual damages as clearly erroneous.

Code § 7431(c)(1)(B)(i) limits actual damages to those "sustained ... as a result of [an] unauthorized disclosure." Although Dr. Barrett put forth evidence to support his contention that he suffered a dramatic loss in business, the district court found that there is little but speculation connecting this loss to the unlawful disclosures. Dr. Barrett himself admits that he has never identified one patient who has ceased, either as a result of the disclosures or out of privacy concerns, to see him or refer to him putative patients. He further concedes that he cannot offer

were not necessary pursuant to Code § 6103(k); nowhere did we question the district court's previous finding that the information sought by the IRS was not "otherwise reasonably available." In other words, we did not question the IRS's decision to use the circular letters as an initial matter; we denounced only its decision to include in those letters the disclosure of the criminal investigation. Our statements cited above are therefore not expressions of our opinion on the scope of damages but merely references to the illegal contents of otherwise lawful letters. To avoid any further confusion, unless otherwise indicated, references to "circular letters" or the mailing of such letters do not criticize the letters themselves or their use, but rather the unlawful disclosures contained within them.

the testimony of even one doctor who has stopped referring patients to him and admits that he has never been denied surgical privileges or suspended on account of the disclosures. Dr. Barrett's other witnesses notably fail to offer a scintilla of evidence connecting his loss of business with the unlawful disclosures. Even Dr. Barrett's strongest witness, Mr. Karl M. Johnson, proved unreliable. Mr. Johnson, a certified public accountant and tax partner at Peat Marwick, created a loss income model to illustrate the amount of loss that Dr. Barrett allegedly sustained from the circular letters; this model, however, takes causation as a given and fails to distinguish among different possible causes for the loss that Dr. Barrett suffered.[7]

The paucity of evidence establishing a causal link between Dr. Barrett's loss and the circular letters left the district court with little choice but to find for the United States. We do not hold this finding to constitute clear error.

*B. Punitive Damages*

Dr. Barrett next argues that the district court erred in rejecting his claim for punitive damages. The court rested its

_____

[7]These additional theories, offered by the United States, include the possibility that (1) a sharp decline in oil prices had a profound economic impact on the Houston economy and Texans seeking plastic surgery; (2) Dr. Barrett's marital troubles had caused him to see fewer patients; (3) the devaluation of the Mexican peso rendered plastic surgery too expensive for Dr. Barrett's Mexican patients and putative patients; and (4) putative patients learned of Dr. Barrett's tax battles not from Agent Hanson's circular letters but from newspaper accounts.

holding on two grounds. First, the court found that the disclosures were neither willful nor grossly negligent. Second, it held that even if punitive damages were recoverable, the plain language and structure of Code § 7431(c) precluded their award in the absence of actual damages. We do not today resolve this statutory interpretation question because we are persuaded that the factual evidence is insufficient to support an award of punitive damages, even if the statute would so allow.

Code § 7431(c)(1)(B)(ii) authorizes a punitive damage award only if the disclosures are willful or grossly negligent. Willful conduct is "that which was done without ground for believing that it was lawful or conduct marked by a careless disregard of whether one has a right to act in such a manner." *Smith v. United States,* 730 F.Supp. 948, 955 (C.D.Ill.1990), *rev'd on other grounds, Smith v. United States,* 964 F.2d 630 (7th Cir.1992). Conduct that is grossly negligent is that which is either willful or marked by "wanton or reckless disregard of the rights of another." *Id.; see also Marré v. United States,* 38 F.3d 823, 826 (5th Cir.1994). Reviewing the district court's holding denying punitive damages for clear error, we do not find conduct by Agent Hanson so egregious as to warrant an award of punitive damages.

Dr. Barrett contends that Agent Hanson's statement in the body of the circular letters disclosing that the IRS was conducting a criminal investigation of Dr. Barrett constitutes willful or

13

grossly negligent conduct.  In support of this contention, he first

points to the fact that Agent Hanson mailed the letters despite his

belief that their receipt may cause Dr. Barrett's patients

"embarrassment, humiliation, or emotional distress."  This

acknowledgment alone does not prove willfulness or gross

negligence.  Section 347.1 of the *Internal Revenue Manual, Handbook

for Special Agents* prohibits an agent from causing only *unwarranted*

embarrassment.  This prohibition therefore implicitly recognizes

that *some* embarrassment is likely to result during any third-party

contact made in the course of a criminal investigation.  That Agent

Hanson appreciated some embarrassment may fall upon patients in

receipt of the letters does not alone evince a willful or grossly

negligent disregard of section 347.1.[8]

Dr. Barrett then points to Agent Hanson's inability to explain

his complete failure to follow the mandates of section 347.2 of the

---

[8]Dr. Barrett appears confused by our footnote in *Barrett I* in which we mentioned that Agent Hanson's acknowledgment of the embarrassment, humiliation, or emotional distress that Dr. Barrett's patients would experience upon receiving the letters is evidence "indicative of Agent Hanson's willfulness or gross negligence."  *Barrett I,* 51 F.3d 475, 480 n. 6. Dr. Barrett reads this dicta to be a holding in which we direct the district court on remand to find that Agent Hanson's conduct constitutes willfulness or gross negligence pursuant to Code § 7431(c)(1)(B)(ii).  Nothing could be farther from the truth.  This language is considerably less than a holding and, even if a holding, merely expresses our opinion that the evidence cited is *indicative* of Agent Hanson's willfulness or gross negligence, leaving to the district court the duty of resolving whether such evidence in fact demonstrates willfulness or gross negligence. On remand, the district court did not so find and we cannot now hold that this finding is clear error.

14

*Handbook for Special Agents,* which requires written approval from the Chief of the CID of the content as well as the use of the circular letters and directs that Special Agents not injure the reputation of the taxpayer under investigation, as evidence establishing willfulness or gross negligence. Dr. Barrett used this same evidence to convince us in *Barrett I* that Agent Hanson had acted in bad faith in contravention of Code § 7431(b). As the district court stated, although this evidence of Agent Hanson's dilatory conduct may be sufficient to support a finding of bad faith, it "cannot alone support a second finding of willfulness or gross negligence. There must be something more." *Barrett II,* 917 F.Supp. at 503. In other words, had Congress meant for the proof burdens to be the same for both a finding of liability under Code § 7431(b) and punitive damages under Code § 7431(c)(1)(B)(ii), it would have so articulated. Instead, Congress directed that liability be found only upon a showing of bad faith and punitive damages only upon a showing of willfulness or gross negligence. The district court's conclusion that Dr. Barrett failed to make the requisite showing for punitive damages is therefore not clearly erroneous. We thus decline to reverse on this ground.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM.

15