**Jerry S. PAYNE, et al.**

v.

**UNITED STATES of America, et al.**

**No. CIV.A.H–93–1738.**

United States District Court,
S.D. Texas.
Houston Division.

Sept. 12, 2003.

Robert Kent Loper, Edward D. Urquhart, Attorney at Law, Jerry Stephen Payne, Payne & Asso, Houston, TX, for Plaintiffs.

Cynthia A. Vance, Andrew L. Sobotka, Dallas, TX, Yvonne Qiyamah Taylor, Judith D. Sanchez, Arthur Lim, Richard H. Cobb, Attorney at Law, Houston, TX, Roy Beene, Attorney at Law, Bonham, TX, for Defendants.

## *AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GILMORE, District Judge.

The Court, having considered the Fifth Circuit's opinion in the above case dated May 7, 2002 [1] and the parties' respective

1. The Fifth Circuit instructed this Court to make particularized findings as to "precisely what information about a criminal investigation was disclosed to which parties under which circumstances." *Payne v. United States,* 289 F.3d 377, 385 (5th Cir.2002). The

motions for further findings, hereby issues its amended findings of fact and conclusions of law.

## I. Background

In this suit Plaintiff Jerry S. Payne ("Payne") alleges that the United States is liable for unauthorized disclosures of his confidential tax return information made by Internal Revenue Agents ("IRS") agents David W. Batista ("Batista"), Kenneth Frelow ("Frelow"), and Colin Levy ("Levy") in violation of Section 6103 of the Internal Revenue Code. In particular, Payne claims that Batista, Frelow, and Levy "unnecessarily and indiscreetly contacted Payne's clients, relatives and other attorneys with which Payne has done business and . . . made wrongful and unauthorized disclosures of confidential 'return information' concerning Payne." (Fifth Amended Complaint, Instrument No. 226, at 9). For this unlawful conduct, Payne seeks actual and punitive damages. The United States denies Payne's contention, arguing instead that their agents did not disclose Payne's confidential return information. In the alternative, the United States maintains that if any disclosures of Payne's return information were made by its agents, such disclosures were authorized by law, or made pursuant to a good faith, but erroneous interpretation of the law.

This case was tried on August 14, 1998. The Court entered its original Findings of Fact and Conclusions of Law on March 19, 1999. The Court's ruling was appealed to the Fifth Circuit, and on May 7, 2002, the Fifth Circuit issued its opinion remanding this case for further fact finding. Accordingly, based on the opinion of the Court of Appeals and the newly established caselaw relevant to these matters, the Court makes the following amended findings of fact and conclusions of law. Any finding of fact that is more appropriately characterized as a conclusion of law shall be so construed.

## FINDINGS OF FACT

1. Payne obtained a Bachelor of Business administration from the University of Texas in Austin, Texas. Later, in 1996, Payne received his Juris Doctorate from the University of Texas School of Law. Payne became licensed to practice law in 1966. Payne first worked as a lawyer for the city attorney's office of Houston, Texas. He then went into the private practice of law in Houston, Texas. He formed a law firm and practiced law from 1974 until 1982. In 1982, Payne left the practice of law and went into the real estate development and construction business in Austin, Texas. After the real estate market crashed, Payne returned to the practice of law in 1985. Payne formed the law firm of Payne & Associates.

2. There were four different law firms sharing the office space where Payne worked. Mr. Robert Shaddox ("Shaddox") was an attorney who worked with Payne from the spring of 1991 to 1996. Shaddox decided to work with Payne because Payne's practice appeared to be growing over the course of three or four years.

3. Payne wanted to work on larger, more complex cases and he had a good network of referrals that would allow him to secure these types of cases. For example, Senator Buster Brown was a client of Payne. Payne worked on cases that were referred to him by Senator Brown. In addition, Payne received referrals from Senator Kay Bailey Hutchison.

4. In September of 1991, Batista began his criminal investigation of Payne. Levy had already prepared an initial report and

Court noted that "determining which of these disclosures were necessary and reconciliation

with *Gandy* will therefore entail further fact finding by the district court." *Id.*

gathered preliminary information regarding the civil investigation of Payne. Levy had substantial contact with Payne. In particular, Levy made very detailed and specific requests to Payne for information regarding 2618, Inc. Batista used Levy's report and information to begin the criminal investigation of Payne.

5. On October 29, 1991, Batista made his initial contact with Payne by arriving at Payne's law office unannounced instead of scheduling an appointment with Payne's office. Batista admitted that he was not prohibited from calling persons who are under criminal investigation in advance. Batista brought Levy and Mr. Hicks to his initial visit with Payne. Levy had been dealing with Payne since 1989.

6. At the initial visit, Batista produced a summons for 2618, Inc. records. Payne told Batista that he would provide Batista with everything that needed to know about himself, 2618, Inc., and Mr. Leo Kalantzakis, a former client of Payne and the former owner of 2618, Inc. Batista did not ask Payne for the bank records concerning his law firm or his law practice. Batista was satisfied with his initial contact with Payne.

7. From October of 1991 to July of 1992, Payne sent numerous letters to Batista asking him to clarify the issues for which Batista wanted information from Payne. Batista wrote a letter to Payne responding to his request. In that letter, Batista informed Payne that he was under investigation by the IRS, but Batista did not give Payne the specific issues for which Batista wanted documents.

8. On December 19,1991, Batista contacted the Texas Lawyers Insurance Exchange by phone and informed Ms. Herbert about the IRS's criminal investigation of Payne. Batista wanted to know about the $36.00 in interest income from the Texas Lawyers Insurance Exchange to Payne. As of this date, however, Batista still believed that Payne was sincere about providing the requested documents and records. Batista conceded that he could have gotten this information from Payne and recognized that his criminal investigation would not have been prejudiced by allowing Payne to provide this information. Batista also admitted that he violated Section 6103 of the Internal Revenue Code by first contacting the Texas Lawyers Insurance Exchange.

9. On January 16, 1992, Payne and Batista reached an agreement on how to disclose the 2618, Inc. records. Payne and Batista agreed to adhere to several guidelines. In particular, the IRS agreed to review the records on a year-to-year basis and inform Payne which records were needed for copying. Payne would then have copies of the requested items made.

10. On January 20, 1992, Payne sent Batista a letter asking him to allow Payne to respond to any specific questions that Batista may have concerning Payne's involvement with 2618, Inc. Payne also informed Batista that he was not waiving his Fifth Amendment rights and that he would not discuss any element of Batista's investigation with him until Batista had more reasonably and fairly narrowed any issues concerning Payne.

11. After scheduling appointments and in accordance with the parties' January 16, 1992 agreement, Batista and Levy came to Payne's office and began to review the 2618, Inc. records and microfilm on January 21, 1992. Batista and Levy continued their review of the 2618, Inc. records at Payne's office on January 22, 1992.

12. As of January 21, 1992, Batista was still happy with Payne's performance, cooperation, and his efforts to produce records. Batista testified that during this period Payne's conduct did not suggest that he was insincere about his willingness to assist with the investigation.

13. On March 2, 1992, Batista and Group Manager Swayzine Fields ("Fields") met with Payne at Payne's office. During this meeting, Batista requested the work papers for Payne's 1987 and 1988 personal tax returns. Payne stated that he would provide the work papers used for the preparation of his 1987 and 1988 personal tax returns during the month of March. This was the first and only documented request for Payne's personal tax records.

14. With the exception of work papers for Payne's 1987 and 1988 tax returns, Batista never asked Payne for other personal records. Payne later told Batista that he did not have any work papers for his 1987 and 1988 tax returns. Batista never asked Payne, in writing or orally, for any additional information regarding his personal tax returns. Later, the IRS concluded that criminal prosecution of Payne for 1988 tax liability was unwarranted.

15. On March 12, 1992, Batista interviewed Mr. Jim Duffus ("Duffus"), a Revenue Officer with the IRS. Batista knew that Payne had given Duffus all of the records regarding 2618, Inc. between January of 1988 and September of 1988.

16. Throughout March of 1992, Batista sent out 10(ten) summons to various corporations and banks seeking bank statements, canceled checks, deposit slips and deposited items, loan applications/agreements and related records concerning Payne. Those summons issued by the IRS to third-parties did not disclose the criminal nature of the investigation of Jerry Payne.

17. Batista also contacted by phone, and met in-person several additional third-parties while investigating Payne. In most of these meetings and phone conversations, Batista revealed the criminal nature of the investigation against Payne, by identifying himself as a special agent with the IRS Criminal Investigation Division and presenting his credentials which state that he is an agent in the Criminal Investigation Division. During the course of the investigation, Batista orally identified himself as an agent in the Criminal Investigation Division or presented his credentials in person, to the following individuals: Leo Kalantzakis, Victoria Sutherland, Tim Winata, Sarah Bilbo, Brian Hughes, Robert T. Jacob, Mara Daly–Brown, Stephen F. Austin, J. Stephen Overby, Lee Joseph, Tina Diamond, and George Fountas.

18. When Batista met with Sarah Bilbo ("Bilbo"), the former bookkeeper for 2618, Inc., he and Levy presented their credentials to Bilbo. Batista asked Bilbo whether she knew if Payne was selling drugs, an inquiry that was gratuitously nasty and prejudicial, which had no basis in fact. Batista also disclosed Payne's return information to Jeff Messock ("Messock") when he mistakenly left a summons for Arnoldus M. Hoegen–Dijkhof at Messock's home. Dijkhof purchased an automobile from Payne and Batista wanted information from Dijkhof regarding the sale of the car. Then, on March 30, 1992, Batista and Ken Frelow ("Frelow") met with George Fountas ("Fountas"), a former shareholder of 2618, Inc. Batista and Frelow identified themselves as special agents with the IRS Criminal Investigation Division and presented their credentials for Fountas's inspection. Batista also disclosed Payne's return information to Terry Graz, a former client of Payne. In total, Batista made more than twenty-two (22) contacts with third-parties during the month of March 1992 alone.

19. Later, on in April 3, 1992, Batista, Levy, and Frelow had a meeting with Virginia Sutherland ("Sutherland"), Payne's former legal secretary, regarding the IRS's criminal investigation of Payne. The agents presented their credentials to Sutherland for inspection.

20. On May 28, 1992, Payne sent Batista a letter documenting the informal agreement reached by the parties on May 21, 1992. Payne and Batista agreed to the following:

1. Payne would not replead in his lawsuit against the IRS as required by Judge Hoyt;

2. Payne would file his 1989 and 1990 tax returns and provide Batista with copies. This would be done by Payne prior to July 27, 1992, which was heretofore the date of the parties' hearing before Judge Hoyt;

3. Batista would put a hold on seeking information as set out in his previous summonses until such time as he receives Payne's tax returns. Upon examination of the 1989 and 1990 tax returns, Batista would give Payne information as to the areas in which Batista required more information; and

4. After Payne received Batista's request in certain areas where he needed more information, Payne would promptly comply with said reasonable request.

21. Batista contacted Jim Schindler ("Schindler"), a real estate broker and a former client of Payne. Batista identified himself as being an agent with the criminal investigation division of the IRS and that he was conducting an investigation of Payne. Batista also informed Schindler that Payne may not have paid all of his taxes. Schindler decided that he would not use Payne's legal services again because of the outstanding criminal investigation by the IRS. He became aware of the investigation as a result of Batista's contact. Schindler also declined to refer any additional clients to Payne because of the criminal investigation.

22. When contacting witnesses, by phone, or in-person, Batista introduced himself as a criminal investigator with the IRS. Batista told these witnesses that he was investigating a possible violation of criminal revenue laws by Payne.

23. After the third-party contacts made by Batista regarding the IRS's investigation of Payne, Shaddox noticed a change in the level of business activity in Payne's law office. Payne's law office no longer received the same volume of phone calls or potential new clients.

24. Shaddox became aware that Payne's clients and other third parties were being informed that Payne was under a criminal investigation. Mr. Guy Matthews, an attorney who shared office space with Payne's law firm, called Payne's office about being contacted by the IRS concerning an investigation of Payne.

25. On July 28, 1992, Batista telephoned Mr. Neal Talmadge ("Talmadge"), a client of Payne and a corporate sales executive for the Houston Arrows Hockey Team, and informed Talmadge that Payne was under investigation. Batista contacted Talmadge to confirm that Talmadge was a client of Payne. Batista also wanted to know if Talmadge would be willing to cooperate with the investigation. Batista had already gone to the Harris County courthouse to confirm that Talmadge had been represented by Payne.

26. Batista testified that he did not feel that he had any obligation to first ask Payne about his clients before contacting them. Batista insisted that the third party contact was a more reasonable and efficient way to get the information.

27. Talmadge was disturbed by the phone call from Batista. Talmadge would not have known about the criminal investigation of Payne if he had not received the phone call from the IRS or subsequently received information from Batista. Had Talmadge not known Payne before, Talmadge would have been reluctant to do business with Payne knowing that Payne

was under criminal investigation. All of the employees at Talmadge's office knew that Payne was under criminal investigation. Some of these employees inquired about Payne's legal services. Talmadge told three or four employees about Payne's law practice and that Payne was under a criminal investigation by the IRS. As a result, these employees had reservations about using Payne's legal services and did not contact Payne regarding their legal needs.

28. Batista issued several additional summonses to former law clients of Payne requesting documents regarding any legal case in which Payne served as their legal representative. Batista also sent summonses to other third-parties who transacted business with Payne or his law firm. The summonses issued by the IRS to third-parties in this case did not disclose the criminal nature of the investigation and the cover letters sent with the summonses to third-parties did not disclose the criminal nature of the investigation of Jerry Payne. Although the certified mail return receipt cards which accompanied these summonses to third-parties contained the words "Criminal Investigation Division" on the return address side of those cards, the evidence does not indicate that any third-parties learned of the criminal nature of the investigation by looking at the return receipts. Batista did however, send twelve fax cover pages which contained the words "Criminal Investigation Division" in the sender's address, but those fax cover pages contained no other information about the nature of the investigation of Payne. Nine of these fax cover pages contained in Plaintiff's Exhibits 95, 97, 99, 100, 125, 112, 183, 172 and 221 were used by the IRS to fax copies of orders dismissing Payne's petition to quash summonses or to follow up on telephone conversations. For the parties that were faxed the order dismissing Payne's petition to quash, Payne had previously served a copy of his petition to quash the summonses on these third-parties containing language which directly disclosed to these third-parties the criminal nature of the IRS's investigation. Therefore, the use of the words, "Criminal Investigation Division" on the IRS fax cover pages did not reveal the criminal nature of the investigation to those recipients, because the recipients already knew. The fax cover pages sent by Batista as follow-up to conversations, similarly did not reveal the criminal nature of the investigation, because Batista had previously disclosed the criminal nature by identifying himself and providing his credentials in the initial conversations. The remaining three fax cover pages at issue contained in Plaintiff's exhibits 98, 101, and 102, which also included the words "Criminal Investigation Division," in the sender's address section, were transmitted to various financial institutions. There is no indication that Batista had previously made oral or written disclosures to the recipients of these three faxes. In addition, Batista contacted people referred to Payne by Senator Brown and Senator Hutchison. For example, Batista contacted Dr. Simeon Wall in Louisiana.

29. Batista asked Connie Rema ("Rema"), Payne's former legal secretary and former client, whether she knew if Payne either used or sold drugs. Rema worked for Payne prior to 1985, before Payne owned Caligula XXI. Batista also asked other employees of Caligula XXI and other people who had business or personal relationships with Payne, such as Payne's brothers and relatives whether they knew if Payne used or sold drugs.

30. On August 26, 1992, Payne sent Batista a letter explaining his frustration with Batista's failure to adhere to their May 21, 1992 agreement. Several of Payne's clients told Payne that they had been contacted by Batista. Bankers, re-

ferral lawyers, and individuals from Senator Brown's office informed Payne that Batista told them that Payne was under criminal investigation. Payne informed Batista that his unnecessary contacts with third-parties was damaging his law practice.

31. The last disclosure of Payne's tax return information by Batista was made to Glenn Fogle in 1995; however, by the time of the trial, Payne was still asked by people whether he has resolved his situation with the IRS.

32. By August of 1996, Payne's law firm was not expanding or receiving new cases.

33. Payne and Payne and Associates, Inc. experienced a significant drop in gross receipts because of the unauthorized disclosures of tax return information made by Batista.

34. James Hill ("Hill") conducted a financial analysis of Payne's law firm. Hill prepared a best case, a worst case, and an average case scenario. He determined the overall lost profits to Payne's law practice and brought that figure back to the present value. There was a severe drop in gross receipts to Payne and Payne and Associates, Inc. between 1993 and 1994 after a steady growth rate for seven (7) to eight (8) years. Hill testified that some event caused this severe drop in gross receipts. However, Hill stated, a number of events could have caused the decline. Hill calculated the damage to Payne and Payne and Associates, Inc. at 3.3. million dollars based on the average case scenario and with Payne working through age seventy (70). Hill then recalculated the figures with the assumption that Payne would retire that the age of sixty (60). The damage amount still totaled 3.3 million dollars. Hill recalculated the damages to Payne and Payne and Associates, Inc. using a discount rate for 1994 through 1997.

35. There are several methods of proof that an agent may use to prove criminal tax liability, including the specific item method and the bank deposit method. Although both methods permit an agent to corroborate admissions and evidence, neither method requires agents to first seek out third-parties. Furthermore, corroboration under either method of proof implies that the taxpayer is given an opportunity to provide the needed information first. Since Payne was not afforded such an opportunity, the type of method of proof used by Batista during the investigation is irrelevant to the discussion of whether there was an unauthorized disclosure of Payne's confidential tax return information.

36. The special agent should provide the taxpayer with a specific list of what he is seeking. The agent should always ask the taxpayer for records first regardless of the method of proof he intends to use. The method of proof that the agent decides to use is inconsequential if the taxpayer is willing to cooperate. If the taxpayer is not cooperating and the specific item method of proof is being used then the agent would need to contact witnesses. However, it is not necessary to go to every client of the taxpayer to corroborate canceled checks.

37. The special agent needs to work with the taxpayer to whatever degree is required to secure the needed records. It is not necessary to contact all of a taxpayer's customers or clients if the taxpayer is willing to provide the records himself. Moreover, if the taxpayer is willing to get the records from the bank or third-parties then the agent should give the taxpayer an opportunity to do that. Disclosures of confidential return information harm the reputation of the taxpayer.

38. In addition, while it is not necessary for an agent to identify himself as a

special agent with the criminal investigation division of the IRS, in *Gandy v. United States*, 234 F.3d 281 (5th Cir.2000), the Fifth Circuit ruled that provisions of the Special Agent's Handbook, and Treasury Regulations clearly provide that agents are authorized to display their credentials and badges identifying them as Criminal Investigation Division agents when interviewing a third party. The Court concluded that an agent's knowledge that his badge identifies his area of investigation supports a reasonable agent's conclusion that he is authorized to orally disclose that he is conducting a criminal investigation.

39. Batista acknowledged that, as a general rule, where the taxpayer is aware of the investigation and is cooperating, the special agent should obtain information directly from the taxpayer or the taxpayer's representative. Batista also recognized that the special agent should be discreet. The IRS regulations are clear and unambiguous. Batista knows that he is required to follow these regulations. Batista is also charged with being familiar with the IRS agents' handbooks. Batista received training on disclosure of confidential tax return information.

40. Regardless of the degree of Payne's cooperation, Batista would still have to get some information from his bank. For example, Batista would need to secure a copy of the signature cards. Batista acknowledged that he could have requested the documentary evidence from Payne; however, he did not ask Payne for such information.

41. Batista did not give Payne a fair opportunity to provide the records first before Batista contacted third-parties. Batista could have conserved the IRS's resources and allowed Payne to provide the information. Batista did not comply with IRS standards of conduct for special agents. It was not necessary for Batista to contact all of Payne's clients. Furthermore, he failed to use his best efforts to obtain the information voluntarily from the taxpayer. Moreover, Batista did not limit the effects of his disclosures as required by IRS regulations, especially as it related to his suggestion of drug activity by Payne.

## CONCLUSIONS OF LAW

■ 1. Section 6103 of Title 26 "forbids the disclosure of return information." *Huckaby v. United States*, 794 F.2d 1041, 1046 (5th Cir.1986) (citing 26 U.S.C. § 6103(a)); *Barrett v. United States*, 795 F.2d 446, 449 (5th Cir.1986). In particular, Section 6103 states that:

> [r]eturn and return information shall be confidential, and except as authorized by this title ... no officer or employee of the United States ... *shall disclose* any *return or return information* obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section.

26 U.S.C. § 6103(a) (emphasis added). Thus, as a general rule, returns and return information shall be confidential. *Barrett*, 795 F.2d at 449. "The need to minimize disclosures is particularly important when it is remembered 'that our voluntary assessment system of tax action is in large measure dependent upon the realization of a taxpayer's expectation that the information required of him for this purpose would be kept confidential.'" *Diamond v. United States*, 944 F.2d 431, 434 (8th Cir.1991) (quoting *Flippo v. United States*, 670 F.Supp. 638, 642 (W.D.N.C.1987)) (emphasizing that Congress realized this fact when enacting Section 6103); *see Johnson v. Sawyer*, 640 F.Supp. 1126, 1132 (S.D.Tex.1986) ("Congress enacted ... [Section] 6103 to protect taxpayers' reasonable expectation that information sub-

mitted to the IRS would remain confidential.").

2. Section 6103(b) defines "return information" broadly, to include:

a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessment, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense . . . .

26 U.S.C. § 6103(b)(2)(A); *see Barrett*, 795 F.2d at 449; *Johnson v. Sawyer*, 640 F.Supp. 1126, 1129 (S.D.Tex.1986) (noting that the term "return information" is broad and encompasses "any information gathered by the IRS regarding a person's tax liability"). Thus, "[r]eturn information includes the taxpayer's identity, the fact that the taxpayer is under investigation or subject to further investigation, and data that the IRS has collected about a return." *Huckaby*, 794 F.2d at 1046.

3. "The term 'disclosure' means the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8). An agent cannot make a decision regarding the method of proof without any regard to the limitations placed on his conduct by Section 6103.

4. The third-party contacts made by Batista through phone calls, in-person meetings, and fax cover letters concerning the IRS's criminal investigation of Payne constitute disclosures of Payne's confidential return information. In particular, Batista's identifying himself as a member of the Criminal Investigation Division and informing third-parties that Payne was under a criminal investigation by the IRS disclosed return information about Payne. *See Diamond,* 944 F.2d at 434. Section 6103 expressly defines return information as "whether the taxpayer's return was, is being, or will be examined or subject to other investigation." 26 U.S.C. § 6103(b).

5. Section 6103 also includes several exceptions to this general prohibition on disclosure. In particular, Section 6103(k)(6) provides that:

[a]n internal revenue officer of employee may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that *such disclosure is necessary* in obtaining information, which is *not otherwise reasonably available,* with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. *Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.*

26 U.S.C. § 6103(k)(6) (emphasis added). Thus, Section 6103(k)(6) allows an IRS officer or employee to disclose return information "to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected . . . ." 26 U.S.C. § 6103(k)(6); *see Barrett,* 795 F.2d at 449. However, such disclosure may only be made "in such situations and under such conditions" as the Secretary of the Trea-

sury may prescribe. 26 U.S.C. § 6103(k)(6). The court does "not question the right, wisdom, or necessity of a particular IRS investigation[,]" but does "question ... the means of investigation, but only to the limited extent consistent with [S]ection 7431" of Title 26, which provides a civil cause of action for improper disclosures of return information. *Barrett*, 795 F.2d at 451.

6. With respect to summonses, the Treasury Regulations state that:

the Commissioner is authorized to summon the person liable for the tax or required to perform the act, or any officer or employee of such person or any person having possession, custody, or care of books of accounts containing entries relating to the business of the person liable for tax or required to perform the act, or any other person deemed proper, to appear before a designated officer or employee of the Internal Revenue service ... and to give such testimony, under oath, as may be relevant or material to such inquiry; and take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry. This summons may be used in an investigation of either civil or criminal tax-related liability. The Commissioner may designate any employee of the Internal Revenue Service as the individual before whom a person summoned ... shall appear. Any such employee, when so designated in the summons, is authorized to take testimony under oath of the person summoned and to receive and examine books, papers, records, or other data produced in compliance with the summons.

Treas. Reg. § 301.7602–1(b).

7. The Treasury Regulations also provide that, in connection with official duties, an officer or employee of the IRS may disclose taxpayer identity information, "the fact that the inquiry pertains to the per-

formance of official duties, and the nature of the official duties in order to obtain necessary information relating to performance of such official duties[.]" Treas. Reg. § 301.6103(k)(6)–1(a). However, disclosure of taxpayer identity information to a person other than the taxpayer at issue should be made

only if the necessary information cannot, under the facts and circumstances of the particular case, otherwise reasonably be obtained in accurate and sufficiently probative form, or in a timely manner, and without impairing the proper performance of the official duties, or if such activities cannot otherwise properly be accomplished without making such disclosure.

*Id.* An IRS officer or employee may also disclose return information in order to obtain necessary information relating to the following:

(1) To establish or verify the correctness or completeness of any return ... or return information;

(2) To determine the responsibility for filing a return, for making a return where none has been made, or for performing such acts as may be required by law concerning such matters;

(3) To establish or verify the liability (or possible liability) of any person, or the liability (or possible liability) at law or equity of any transferee or fiduciary of any person, for any tax, penalty, interest, fine, forfeiture, or other imposition or offense under the internal revenue laws or the amount thereof to be collected;

(4) To establish or verify misconduct (or possible misconduct) or other activity proscribed by the internal revenue laws;

(5) To obtain the services of persons having special knowledge or technical skills ... or having recognized expertise in matters involving the valuation of

property where relevant to proper performance of a duty or responsibility described in this paragraph;

(6) To establish or verify the financial status or condition and location of the taxpayer against whom collection activity is or may be directed, to locate assets in which the taxpayer has an interest, to ascertain the amount of any liability . . . to be collected, or otherwise to apply the provisions of the Code relating to establishment of liens against such assets, or levy on, or seizure, or sale of, the assets to satisfy any such liability; or

(7) To prepare for any proceedings described in section 6103(h)(2) or conduct an investigation which may result in such a proceeding, or where necessary in order to accomplish any activity described in subparagraph (6) of this paragraph.

Treas. Reg. § 301.6103(k)(6)–1(b). Again, a disclosure of return information to someone other than the taxpayer being investigated should only be made if such information cannot otherwise be reasonably obtained. *Id.*

8. The IRS provides conduct guidelines for Special Agents during investigations as follows:

a. All returns and return information are confidential and may not be disclosed except as authorized by the Internal Revenue Code. . . . [C]ivil actions for damages are permitted against the Government [for unauthorized disclosures] . . . . The fact that a person has filed a tax return or is under investigation is [return information] . . . . Disclosure is the making known of returns or return information in any manner. A disclosure may be either direct or indirect.

Internal Revenue Manual—Administration, Special Agents Handbook, ¶¶ 348.1–348.2.

b. Tactful—As professionals, special agents should always exercise good judgment. He/she should be tactful in all aspects of the investigation so that actions and/or remarks are not likely to be misinterpreted.

Internal Revenue Manual—Administration, Investigative Procedures, ¶ 9382.1(3).

c. Discreet—A special agent should be discreet in all investigations conducted. He/she must not make statements or ask questions that will divulge information which would tend to jeopardize the successful conclusion of the investigation. He/she must not unnecessarily injure the reputation of the person being investigated.

Internal Revenue Manual—Administration, Investigative Procedures, ¶ 9382.1(4).

d. All criminal investigations should be started and concluded as expeditiously as possible. They should be conducted impartially and thoroughly to obtain all critical information and evidence. Duplication in investigations, unnecessary inconveniences to the public and unnecessary embarrassment to the taxpayer should be avoided. Appropriate courtesies should be shown when soliciting information.

Internal Revenue Manual—Administration, Policies of the IRS Handbook, ¶ P–9–29.

e. As a general rule, in instances when the taxpayer is aware of the investigation, is cooperating, and is believed to have the needed information, special agents should obtain such information directly from the taxpayer or the taxpayer's representative unless to do so might tend to prejudice the investigation.

Internal Revenue Manual—Administration, Special Agents Handbook, ¶ 348.3.

f. A special agent should use his/her best efforts to obtain information voluntarily from taxpayers and witnesses.

Internal Revenue Manual—Administration, Special Agents Handbook, ¶ 363.

g. Detrimental effects to be avoided are:

1. unnecessary embarrassment to the principal.

2. needless disclosure of the Government's affairs or information of a confidential nature.... In any event, whenever the special agent first officially meets with the subject of the investigation, he/she should be introduced as "Special agent, Internal Revenue Service," and will produce his/her credentials for examination.

Internal Revenue Manual—Administration, Special Agents Handbook, ¶¶ 3(10)8.1(5)(c), 3(10)8.1(7), 3(10)8.11(5)(c).

h. Mail circularization is a written request to third parties for information where more than ten letters of a similar nature are sent. Mail circularization to obtain third party evidence may be, under certain circumstances, the most practical means of obtaining documentary evidence in an investigation when a large number of persons, widely scattered geographically, need to be reached. If not judiciously used, mail circularization may result in unwarranted embarrassment to the taxpayer .... A special agent should exercise caution not to damages the reputation of the taxpayer by making the letter either offensive or suggestive of any wrongdoing by the taxpayer.

Internal Revenue Manual—Administration, Special Agents Handbook, ¶¶ 347.1, 347.2(3).

■ 9. The fact that an agent has given prior "in court" testimony relative to the taxpayer's "return information," which likely removes this information from its otherwise "confidential" cloak, does not justify the agent's violation of the requirement that he, as an officer of the United States, is prohibited from disclosing "return information" absent express statutory authorization. *See Johnson v. Sawyer*, 120 F.3d 1307, 1318–19 (5th Cir.1997); *Rodgers v. Hyatt*, 697 F.2d 899, 906 (10th Cir. 1983); *Mallas v. United States*, 993 F.2d 1111, 1120 ("The Government points to no such exception—and we are aware of none—permitting the disclosure of 'return information' simply because it is otherwise available to the public."). Simply because "'an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of information.'" *Mallas*, 993 F.2d at 1120 (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 1480, 103 L.Ed.2d 774 (1989) (citations omitted)); *see Johnson*, 120 F.3d at 1318–19.

■ 10. Under Section 7431(a)(1) of Title 26, a taxpayer may bring a civil action for damages against the United States for knowing or negligent disclosure of returns or return information by United States employees. 26 U.S.C. § 7431(a)(1). Section 7431(a)(1) states, in pertinent part, that "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or *return information* with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States." 26 U.S.C. § 7431(a)(1) (emphasis added). Thus, to obtain damages for wrongful disclosure under Section 7431(a)(1), a plaintiff must prove: (1) that

a government employee knowingly or negligently disclosed confidential tax return information; and (2) that the disclosure was not authorized by Section 6103. *Wilkerson v. United States,* 67 F.3d 112, 115 (5th Cir.1995).

11. Without first determining whether the information sought was otherwise reasonably available, Batista contacted a large number of Payne's clients, several of his business associates, friends, relatives, and employees of state and local law enforcement agencies. Batista disclosed numerous items of return information to these persons. For example, on several occasions, when making these third-party contacts, Batista disclosed the fact that Payne was under criminal investigation by the IRS. Furthermore, there was no evidence that any of the disclosures of Payne's confidential return information, either through phone calls, in-person meetings or fax cover pages, were necessary to obtain the information that Batista sought. Nonetheless, nine of the fax cover pages sent by Batista are not actionable, because they were not actual disclosures of the criminal nature of the investigation, as they were either transmitted to third-parties who already knew of the criminal nature of the investigation, because they received copies of the Payne's petition to quash the summonses, or they were transmitted to third-parties who Batista had previously spoken with and identified himself as a Criminal Investigation Division agent, or had presented his credentials. The Court holds that it was not necessary for Batista to disclose the various items of return information to the third-parties that Batista contacted by telephone, in-person, or by fax, especially since the information repeatedly offered by Payne and refused by Batista was ultimately delivered to Gregory Gallagher of the United States Department of Justice, Tax Division, Criminal Section. The Court further holds that such disclosures were made knowingly or by reason of negligence, and thus, were in violation of Section 6103, however, the good faith exception operates to protect the United States from liability for all of the oral disclosures of the criminal nature of the investigation and the written disclosures made in the three fax-cover pages sent to financial institutions.

12. Batista also asked numerous third-parties, including clients of Payne, questions about whether or not Payne used or was involved in illegal drugs. Batista contends that a witness allegedly told him that Payne was involved in drugs or other criminal activity, however, Batista could not remember the name of the witness or whether such information was obtained during a formal or informal interview. The Court finds that there was no rational basis for Batista to ask these questions particularly in light of IRS regulations that require special agents to avoid "unnecessarily injur[ing] the reputation of the person being investigated." Internal Revenue Manual—Administration, Investigative Procedures, ¶ 9382.1(4).

13. Recovery under Section 7431(a)(1) must be denied if the disclosure "results from a *good faith,* but erroneous interpretation of section 6103." 26 U.S.C. § 7431(b)(1) (emphasis added). The "good faith" exception protects the United States from liability where the alleged violation arises from a good-faith misunderstanding of Section 6103. *See* 26 U.S.C. § 7431(b)(1). In determining whether an agent has behaved in "good faith," the Fifth Circuit has adopted the following objective standard: officials act "in good faith when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Huckaby,* 794 F.2d at 1048 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d

396 (1982)). "A reasonable IRS agent can be expected to know the provisions of [S]ections 6103 and 7431, as they may be further clarified by IRS regulations and other IRS interpretations." *Huckaby,* 794 F.2d at 1049; *Heller v. Plave,* 657 F.Supp. 95, 98 (S.D.Fla.1987). "An agent's contrary interpretation is not in good faith." *Barrett,* 51 F.3d at 479. In *Gandy v. United States,* 234 F.3d 281, 286 (5th Cir. 2000), the Fifth Circuit ruled that because of the differences in the nature of circular letters or mass mailings and personal contact where oral disclosures are ordinarily made, a reasonable agent would conclude that the specific rules prohibiting written disclosure of the criminal nature of investigations would not apply to all disclosures, including oral disclosures. Furthermore, the Fifth Circuit explained that an agent's knowledge that he is authorized to display his credentials which identify him as Criminal Investigation Division agents, supports a reasonable agent's conclusion that he may verbally disclose the nature of his investigation to third parties. *Id.* The Court concluded that the good faith exception excuses oral disclosures of the criminal nature of investigations, because a reasonable agent may conclude that he is authorized to orally disclose that he is conducting a criminal investigation. *Id.*

14. Applying an objective good-faith test, consistent with *Gandy,* to the facts of this case, the Court finds that Batista's oral disclosures to third-parties of the criminal nature of the investigation, while unnecessary, were in good faith. Also, the three fax cover sheets sent to the financial institutions, which also unnecessarily stated that the words "Criminal Investigation Division," were transmitted by Batista in good faith. These three fax cover sheets, contained in Plaintiff's exhibits 98, 101 and 102 where each transmitted prior to June 12, 1992. At this time, a special agent reading Section 347.2 of the Internal Revenue Manual, Special Agents Handbook, would have been informed that the restrictions, which reference circular letters provided that the use of the words "Criminal Investigation Division" was still appropriate in letter head and signature blocks. Internal Revenue Manual § 347.2 provided in relevant part:

> Any reference to the Criminal Investigation Division must be restricted to the signature blocks or ancillary headings.... The title "Special Agent" and Criminal Investigation Division will be included in the signature block.

Accordingly, because there is no specific regulation which references fax cover pages, based on this provision in the Special Agent's Handbook, a reasonable agent would not have concluded that the use of the words "Criminal Investigation Division" on the fax cover page was improper, because the sender's address on the fax cover page may be appropriately considered an ancillary heading. Therefore, the three faxes to the financial instructions containing this language sent by Batista before June 12, 1992 were disclosures of the criminal nature of the investigation however, they fall within the good faith exception.

15. As for Batista's comments regarding whether Batista was involved in illegal drugs, the court finds that such suggestions "... depict a lack of integrity on the part of the government. Such careless conduct must be reprimanded. The responsibilities of the IRS are gravely important and should not be tainted by irresponsible comments." *Heller,* 657 F.Supp. at 99. The government "must bear responsibility for improper disclosures. Section 6103 acts as a restraint on unsuitable behavior among IRS agents and mandates the protection of our government's rectitude." *Id.*

16. "Once liability attaches, a court must make determination of damages consonant with" Section 7431(c). *Barrett v.*

*United States,* 100 F.3d 35, 38 (5th Cir. 1996). Section 7431 provides that:

[i]n any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) the greater of—

(A) *$1,000 for each act of unauthorized inspection or disclosure* of a return or return information with respect to which such defendant is found liable, or

(B) the sum of—

(i) the *actual damages sustained by the plaintiff,* as a result of such unauthorized inspection or disclosure, plus

(ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, *punitive damages,* plus

(2) the costs of the action.

26 U.S.C. § 7431(c) (emphasis added). Specifically, Section 7431 "limits actual damages to those 'sustained . . . as a result of [an] unauthorized disclosure.'" *Barrett,* 100 F.3d at 40 (quoting 26 U.S.C. § 7431(c)(1)(i)).

17. In *Barrett v. United States,* 917 F.Supp. 493, 495 (S.D.Tex.1995), the court examined whether the plaintiff, a plastic surgeon, had proved that actual damages "were inflicted by the disclosure of the criminal investigation in circular letters" sent by the IRS. The plaintiff's position was that, "but for the circular letters, his [medical] practice would have been more substantial. The patients of a plastic surgeon are particularly concerned that their privacy be maintained." *Id.* at 496. The plaintiff then argued that "when 260 [of his] patients received this letter, they would have become angry with . . . [him] because their privacy had been breached[.]" *Id.* Furthermore, according to the plaintiff, "when the patients read that . . . [he] was under criminal investigation, they would have thought less of . . . [him] as a law abiding citizen." *Id.* Consequently, the plaintiff "maintained that both of these circumstances would render the patients disinclined to return to him for further plastic surgery and to recommend him to their friends." *Id.*

The court held that "the decrease in patients was [likely] a result of a combination of factors, the most unlikely of which, given the totality of evidence, was the disclosure in the IRS letter." *Id.* at 502. The court emphasized that "any actual damages must have arisen from the disclosure to the patients of the criminal investigation and not from the concern of the patients that their privacy had been breached." *Id.* In fact, the court found that there was no "evidence that any physician had, in fact, not referred patients [to the plaintiff] because of the letters[.]" *Id.* at 496. The plaintiff, himself, admitted that he has never identified one patient who had refused, either as a result of the disclosures or out of privacy concerns, to see him or any doctors that declined to refer patients to him. *Id.* at 499. Furthermore, "the testimony of the physicians among the witness all emphasized that . . . [the plaintiff] enjoyed an excellent reputation as a surgeon." *Id.* The Court then criticized the expert certified public accountant's "lost income model," his assumption of causation, and his failure to "differentiate the damage that he maintained was caused by the improper disclosure in the circular letters from the damage that the many other [identified] factors that could have contributed to the drop in the number" of the plaintiff's patients. *Id.* at 502. Given that only speculation connected the loss in patients to the unlawful disclosures, the court determined that the plaintiff had failed to prove that he suffered actual damages from the improper disclosures in the circular letters. *Id.* at 497–502.

18. Unlike the situation in *Barrett,* Payne presented evidence that the damage he sustained to his law practice and law firm was caused by the improper disclosures by Batista. Shaddox testified that there was a noticeable change in the level of business activity, including client referrals, in Payne's law firm after the third-party contacts were made by Batista. In addition, Schindler, a former client of Payne who was contacted by Batista, indicated that he would not use Payne's legal services again or refer any additional clients to Payne because of the outstanding criminal investigation by the IRS. Talmadge, another client of Payne's who was contacted by Batista, stated that he would not have known about the criminal investigation of Payne if he had not received a phone call from Batista. When asked by co-workers about Payne's legal services, Talmadge informed them about the IRS investigation. Consequently, Talmadge's co-workers did not contact Payne.

 Furthermore, Hill, Payne's expert witness, testified that there was a severe drop in gross receipts to Payne's law firm between 1993 and 1994 after a steady growth rate for seven (7) to eight (8) years. Although Hill did not attempt to conclusively establish the cause of this severe drop in gross receipts, the United States did not offer any additional theories for the loss that Payne suffered. *Cf. Barrett,* 917 F.Supp. at 495 (noting the United States's opposition to the taxpayer's requested actual and punitive damages award and emphasis that it vigorously contested the taxpayer's damage claims at trial on cross examination, namely, by offering additional theories of causation). In this case, there is more than mere speculation to support the conclusion that the decline in clients and client referrals was caused by Batista's disclosure of the criminal nature of the investigation. The evi-

dence of damages presented by Plaintiff is based on the disclosure of the criminal nature of the investigation to clients and potential clients. However, this Court has already determined that Batista's oral disclosures and written disclosures of the criminal nature of the investigation found in fax cover sheets, are protected by the good faith exception. There is no evidence that Payne suffered actual damages as a result of Batista's comments that he may be involved in drugs. Also, even if nine of the twelve fax cover pages, containing the words "Criminal Investigation Division" were actionable, these faxes were sent to financial institutions, where Payne held accounts. The evidence presented on damages during trial was based on the reduction of his law firm revenues, and not on the loss of any loans or credit from financial institutions. Accordingly, there is no basis upon which the Court can award recovery to Payne.

19. Nonetheless the Court feels obligated to find that the conduct exhibited by Batista was egregious. For example, Batista testified that he never calls to make an appointment, but rather arrives at the taxpayer's location, his place of residence or business, unannounced. Batista, however, acknowledged that he was not prohibited from calling Payne in advance to schedule an appointment. Furthermore, Batista made devastating disclosures regarding Payne's suspected involvement in illegal drugs to Payne's clients, business associates, friends, and relatives. Batista, incredulously, maintained that asking third-parties whether a person was a drug dealer would not hurt that person's reputation. In particular, Batista attempted to convince the Court that he sought to protect Payne's reputation by distinguishing between "asking" whether Payne was a drug dealer and "saying" that Payne was a drug dealer. According to Batista, a simple inquiry would not injure that person's reputation. The Court finds this testimo-

ny to be insincere and entirely reflective of Batista's cavalier attitude. Moreover, as mentioned, under Section 6103, an IRS agent has discretion to disclose return information to the extent that the information is necessary and not otherwise reasonably available. 26 U.S.C. § 6103. Batista grossly abused that discretion. Batista made a number of third-party contacts without first giving Payne an opportunity to provide the needed information. Batista also initially insisted that there was no requirement that an agent obtain as much information as possible from the taxpayer before contacting third-parties. Later, Batista admitted that his conduct violated the IRS manual and regulations. In addition, Batista had no rational explanation for his conclusion that Payne was not being sincere about his willingness to cooperate and his desire to assist Batista in the investigation. However, because Payne was unsuccessful in identifying disclosures by Batista of the criminal nature of the investigation, in particular, which were either actionable, or not protected by the good faith exception, the Court is unable to award, punitive damages or attorney's fees for Batista's outrageous conduct. Payne is not a prevailing party as that term is used in 26 U.S.C § 7430, therefore he is not entitled to attorneys fees under Section 7430.

21. Payne's agitation with Batista's course of conduct is understandable. *See Diamond*, 944 F.2d at 434. "In our society, even without an actual conviction, the suggestion of criminal activity can transform and devastate an individual's life[.]" *Id.* In Payne's case, it destroyed the confidence of his clients in their lawyer and of others in a potential lawyer, leaving Payne without a practice. However, consistent with the Fifth Circuit's ruling in *Gandy*, Batista's oral disclosures of the criminal nature of his investigation against Payne, were initially made when Batista's identified himself as a special agent in the Criminal Investigation Division or presented his credentials, these type of oral disclosures are protected by the good faith exception. Furthermore, the written disclosures which revealed the criminal nature of the investigation are also protected by the good faith exception. Accordingly, Payne cannot recover damages and the Court **ORDERS** that Payne takes nothing in this case.

The Clerk shall enter this Order and provide a copy to all parties.

### *AMENDED FINAL JUDGMENT*

Based on the Court's Amended Findings of Fact and Conclusions of Law, dated September 10, 2003, the Court finds in favor of the United States. The Plaintiff takes nothing in this case.

This is a **FINAL JUDGMENT**.

The Clerk shall enter this Order and provide a copy to all parties.